**UNITED GROCERS, LTD., Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

No. 38411.

United States District Court
N. D. California, S. D.
Aug. 10, 1960.

727

offTaylor & Winokur, San Francisco, Cal., for plaintiff.

Lynn J. Gillard, U. S. Atty. and Thomas E. Smail, Jr., Asst. U. S. Atty., San Francisco, Cal., for defendant.

SWEIGERT, District Judge.

This is a suit brought by plaintiff, United Grocers, Ltd., against defendant, United States of America, to recover income taxes amounting to $77,736.49, with $16,191.55 interest, which, plaintiff contends, were improperly determined by the Collector of Internal Revenue to be income tax payable for the year 1954.

The Collector assessed the tax upon the ground that certain payments received by the corporation from its members in that year were payments in return for corporate services rendered to its members and, therefore, taxable income, as distinguished from what plaintiff contends were capital contributions from the members to the corporation and, therefore, excludable from corporate income.

Plaintiff is a corporation organized under the laws of California, empowered to engage in a general wholesale and retail grocery and merchandise business and in general business activity.

According to its Articles of Incorporation, it is a cooperative, nonprofit, membership (nonstock) corporation and is formed for the purpose of creating a cooperative buying, marketing and service organization for the benefit of its members; it is not in any way the purpose of the corporation that profits or pecuniary gains be realized for the members; the excess of its receipts from the obtaining for and delivery of goods to members, over and above the expenses of such obtaining and delivery, is to be returned to the members in the form of patronage refunds which shall be declared out each calendar year.

Among other things, its Articles empower it to give and render store services of every kind and description to its members, business and store engineering advice, and to engage in advertising and merchandising service of any and all kinds for its members.

The corporation actually sells groceries to both members and nonmembers at the same billing price, but only members receive price reductions by way of patronage refunds.

Profits from sales to nonmembers and from investments are retained by the corporation and do not enter into the computation of patronage refunds or reduce the price of groceries purchased by members. Nor, are nonmember patrons

granted any interest in such capital accumulations as result from their patronage.

In order to acquire and maintain membership in United Grocers, and thereby obtain the privilege and service of patronage refunds, a retail grocer is required to pay (a) an initiation fee of $25, returnable if rejected for membership, but otherwise credited to the capital of the cooperative; (b) a membership certificate payment of $50; (c) any assessment or contribution to capital which is then payable in advance by the members; (d) a payment into the Guarantee Fund, if the member desires deliveries of groceries, of $500 ($1,000, if he desires deliveries of both grocery and produce) or $350 from junior members ($700 or less if junior member desires deliveries of both grocery and produce).

Further, any member desiring a withdrawal card is required to pay (e) a withdrawal fee of $3, and new members, succeeding to the business of a retiring member, are required to pay (f) a transfer fee of $10 instead of a new initiation fee.

It is further provided that the Directors shall determine from time to time whether dues and/or assessments as capital contributions shall be paid by the members, and the amounts and the times of payment thereof—dues not to exceed $7.50 per month ($3.75 per month for junior members); and assessments as contributions to capital not to exceed $10 per month ($5 per month for junior members).

Section 4 of Article VI of the Articles provides that "the payments provided in Section 2 of this Article to be made into the Guarantee Fund" (i. e., the payments noted in (d), supra) "shall be payments for working capital of this corporation, * * * and this Guarantee Fund, as well as the patronage refund account, shall be subject to the claims of creditors, and shall not be subject to offset against sums owing from the members, and shall remain the property of the corporation to be held against payments provided to be made to members on their withdrawal, members being required to pay their accounts for purchases within five days of statement."

Upon resignation, a member is entitled, upon surrender of his membership certificate, to return, in the form of cash or debentures, of "the monies paid by the member for the membership certificate" (i. e., the payment noted in (b), supra) and the payments "into the Guarantee Fund" (i. e., the payments noted in (d), supra), together with any patronage refund due.

On withdrawal, as distinguished from resignation, the member is entitled only to return of payments made into the Guarantee Fund (i. e., the payments noted in (d), supra).

The membership certificate cannot be transferred or pledged, nor can "any other interest he may have in this corporation or any assets thereof, or any funds on deposit therewith." Any attempt to transfer shall terminate membership, provided only that 30 days arrangements can be made for the successor in the business of the retiring member to continue the original membership of that business upon payment of a transfer fee of $10 (see (f), supra), instead of a new initiation fee, the successor, however, being treated for all purposes as a new member and the retiring member to receive, upon surrender of his membership certificate, his membership certificate fee ((b), supra), and his payments into the Guarantee Fund—as in the case of a resignation ((d), supra).

It should be noted that there is no provision for return or repayment in any manner or at any time, to a member, upon withdrawal or resignation or otherwise, of any sums paid in by him either as dues and/or assessments as contributions to capital.

The only return entitlement of such a member is to the money paid for his membership certificate (i. e., the payments noted in ((b), supra), the money paid into the Guarantee Fund (i. e., the payments noted in (d), supra), and, of course, any patronage refunds due.

The Commissioner of Internal Revenue determined that certain payments received from members, i. e., initiation fees of $25 ((a), supra), withdrawal fees of $3 ((e), supra), transfer fees of $10 ((f), supra), and the $7.50 monthly payments from members ($3.75 per month from junior members), heretofore mentioned (claimed by the government to be dues for services rendered and therefore taxable income, and claimed by the co-operative to be capital contributions, and therefore nontaxable), could *not* be excluded from gross income.

The corporation paid the tax resulting from the Commissioner's determination, filed a claim for refund, which was disallowed by the Commissioner, and followed with this suit to recover said tax.

Because the monthly payments here involved constitute the great bulk of the money in controversy, our discussion will be couched mainly in terms of this item.

Since the corporation was organized in 1910 and up to 1952, its members have been required to make monthly payments called "dues" to maintain their membership. These dues have been $7.50 a month since the early 1920's and were included in gross income by the corporation prior to 1952. However, they were also included with payments made for the purchase of groceries in computing patronage refunds and, therefore, were in effect returned to members and deducted in determining the corporation's taxable income.

On December 17, 1951, the corporation sent its members a notice of a special membership meeting to be held on December 27, 1951, to amend its Articles and By-Laws. On December 19, 1951, the corporation's Secretary-Manager directed a letter to the members explaining the reason for and the effect of the proposed amendments. The members were told that the amendments were necessary to avoid the effect of possible legislation which would be unfavorable to the taxation of cooperatives; they were also told that it would be desirable to have additional funds in the event of an emergency or depression. The explana-

tion concluded by stating that "(W)ith the exception of the difference in the method of accounting for the dues, the terminology does not affect any change in the method of our operation."

The Articles and By-Laws were in due course amended at the membership meeting to give the Board of Directors the power to determine from time to time whether some portion or all of the $7.50 monthly payments would be "dues" or "assessments as contributions to capital."

The Board of Directors held a special meeting after the members' meeting on December 27, 1951, and ratified the amendments to the Articles and By-Laws. The Board also discussed the exercise of its newly acquired power but took no formal vote and passed no resolution to assess capital contributions. The membership received no formal notification of any corporate action taken to make "capital contributions" of all or part of the $7.50 monthly payments which had been theretofore treated as "dues". The corporation did, however, in fact, put into operation a plan to treat what were formerly dues as capital contributions.

A change was made in the characterization of the mandatory monthly payments on the books of the corporation. Although the $7.50 monthly payments were still shown as accounts receivable along with grocery purchases on the members' ledger accounts, the corporation discontinued the "Dues" account and included the same monthly payments in a "Capital Contributions" account. Also, in 1952, the monthly billing was changed from "Dues" to "Capital Contributions—(Dues)".

However, the members received exactly the same rights and services from the corporation as they had received prior to 1952. Both before and after 1952, the members had to make the $7.50 monthly payments to be eligible to receive patronage refunds; only members who were current in all payments received these patronage refunds. The only substan-

tive difference in operation was that from 1952, dues were no longer included with grocery purchases in computing the amount due as patronage refunds, but were retained by the cooperative.

■ From the evidence it appears, and the Court finds, that the Board of Directors, failing to adopt any resolution to put their new power into effect one way or the other, did not determine the matter in the manner required for corporate action, especially a matter of importance in its effect upon the rights of its members and the government as well.

However, the Court will not rest its ruling upon this point alone but will also consider the case upon the assumption for purposes of discussion, that the Board of Directors had taken the necessary, formal action.

Since plaintiff claims that the payments in question thus retained after 1951 as "contributions to capital", it may be well to consider at the outset the ordinary meaning of that term.

■ The term "capital", as applied to corporations, is the money, property or means contributed by stockholders as the fund or basis for the business or enterprise for which the corporation was formed. The term generally implies that such money, property or means have been contributed in payment for stock issued to the contributors. 18 C.J.S. Corporations § 193, p. 616.

■ The term "contribution to capital," as applied to corporations, means the fund or property contributed, or agreed to be contributed by share holders, generally through stock subscription, as the financial basis for the prosecution of the business of the corporation—those resources whose dedication to the users of the corporation is made the foundation for the issuance of capital stock and which, as a result of the dedication, become irrevocably devoted to the satisfaction of all the obligations of the corporation. Detroit Edison Co. v. Commissioner, 1943, 319 U.S. 98, 63 S. Ct. 902, 87 L.Ed. 1286.

■ Such capital contributions do not create a debt liability from the corporation to the contributor but they do create a right of the contributor to some stated interest or right in the management of the corporation, in its surplus profits, and, on the winding up of the corporation, to a rateable share in the distribution of its assets after the claims of creditors have been satisfied. 18 C.J.S. Corporations §§ 193, 194, pp. 618, 620.

As stated by Waas & White (Application of Federal Income Tax to Farmers' Cooperatives, p. 128), for all practical purposes, "a capital equity in a cooperative association is any stated right or any stated monetary credit, whether certificated or not, that legally ranks *after* general creditors in the distribution of an association's assets upon dissolution. If only one type of capital equity is in use, it carries a common-law right to a proportionate share of any assets which may remain after all creditors have been satisfied. Thus, it is redeemable at *face value*, plus its share of any gain or minus its share of any loss that may exist."

■ Property or money given to a corporation by a nonstockholder and one who has no proprietary interest in the corporation may sometimes be considered as contributions to capital by the corporation for its own purposes. Crean Bros. v. C. I. R., 3 Cir., 1952, 195 F.2d 257; Commissioner v. McKay Products Corp., 3 Cir., 1949, 178 F.2d 639; Brown Shoe Co. v. Commissioner, 1950, 339 U.S. 583, 70 S.Ct. 820, 94 L.Ed. 1081.

Capital contributions, whether made by shareholders or outsiders, must be related only to the characteristics of such capital contributions as above set forth and not to other considerations running to the contributor. Milman, Inc. v. C. I. R., 2 Cir., 1940, 114 F.2d 95, 96; Crean Bros. v. C. I. R, supra; George Hall Corp. v. Shaughnessy, D.C. N.D.N.Y.1946, 67 F.Supp. 748. They must therefore be distinguished from other kinds of payments to a corporation, for example, loans to the corpora-

tion, *Byerlyte Corp. v. Williams,* D.C. N.D.Ohio 1959, 170 F.Supp. 47, 55; sales to the corporation, *Ackerman v. C. I. R.,* 7 Cir., 1935, 76 F.2d 833; and payments to the corporation for services rendered to the contributor. Upon this last distinction the Collector of Internal Revenue ruled adversely to the plaintiff.

Section 61(1), Internal Revenue Code, 26 U.S.C.A. § 61(i), provides:

"Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items."

Since 1954 Internal Revenue Code, Section 118, 26 U.S.C.A. § 118, has also provided as follows:

"In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer."

The Commissioner's regulations under Section 118 provide as follows:

"§ 1.118–1. Contributions to the capital of a corporation. In the case of a corporation, section 118 provides an exclusion from gross income with respect to any contribution of money or property to the capital of the taxpayer. Thus, if a corporation requires additional funds for conducting its business and obtains such funds through voluntary pro rata payments by its shareholders, the amounts so received being credited to its surplus account or to a special account, such amounts do not constitute income, although there is no increase in the outstanding shares of stock of the corporation. In such a case the payments are in the nature of assessments upon, and represent an additional price paid for, the shares of stock held by the individual shareholders, and will be treated as an addition to and as a part of the operating capital of the company. Section 118 also applies to contributions to capital made by persons other than shareholders. For example, the exclusion applies to the value of land or other property contributed to a corporation by a governmental unit or by a civic group for the purpose of inducing the corporation to locate its business in a particular community, or for the purpose of enabling the corporation to expand its operating facilities. However, the exclusion does not apply to any money or property transferred to the corporation in consideration for goods or services rendered, or to subsidies paid for the purpose of inducing the taxpayer to limit production. See section 362 for the basis of property acquired by a corporation through a contribution to its capital by its stockholders or by non-stockholders."

Both plaintiff and defendant rely upon authorities dealing, not with contributions by shareholders or members to their corporation, but with contributions by outsiders to a corporation.

Plaintiff relies mainly upon *Brown Shoe Co. v. Commissioner,* 1950, 339 U. S. 583, 70 S.Ct. 820, 94 L.Ed. 1081 (see also *Commissioner v. McKay Products Corp.,* 3 Cir., 1939, 178 F.2d 639), in which the Supreme Court held that cash and other property received from certain community groups as inducement to the location or expansion of a manufacturing corporation, could be considered nontaxable as capital contributions by the corporation.

The Court distinguished *Detroit Edison Co. v. Commissioner,* 1943, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286, one of the cases relied on by the government here, upon the ground that in the latter case certain payments received by an electric company from prospective customers for construction of line extensions to the premises of applicants for service were in effect the price for service, and, therefore, income to the corporation, whereas in the Brown Shoe case, the contributions were provided without any direct service or recom-

pense whatever, the only expectation of the contributors being possible advantage to the community at large.

In Teleservice Co. of Wyoming Valley v. Commissioner, 3 Cir., 1958, 254 F.2d 105, certiorari denied 1958, 357 U.S. 919, 78 S.Ct. 1360, 2 L.Ed.2d 1364, relied upon by the government here, the Court, following Detroit Edison Co., supra, and distinguishing Brown Shoe Co. v. Commissioner, supra, and Commissioner v. McKay Products Corp., supra, held that contributions received by a television signal transmission service from its customers, pursuant to contract, toward the cost of constructing television facilities to be used by the customers upon payment of further fees, were not gifts or capital contributions but were in effect part of the price of service under the circumstances and, therefore, taxable income to the corporation.

The plaintiff taxpayer's contention in the pending case that its member contributors received neither goods nor services in return for their monthly contributions, is correct in one sense. They did not receive groceries. Groceries were billed to the members as purchased subject to the member-patron's right to a patronage refund on his purchases.

Plaintiff taxpayer's contention is not correct, however, to the extent that it ignores the fact that its member-contributors did receive for their contributions the privilege and service of large scale purchasing power through such patronage refunds—a privilege and a service for which they would not have been eligible without payment of these initial and monthly contributions. Similarly, the contributors received other trade services from the cooperative.

It should be noted that in Teleservice, Inc., supra, there is a similarity to the present situation in the respect that the contributions here did not entitle the contributors to any specific television service. They were required to pay for the actual service through so-called monthly maintenance fees. But, their contributions did entitle them to the right to participate in the available service upon payment of those monthly fees.

Plaintiff taxpayer argues that the dispersing of patronage refunds or their equivalent is the singular, characteristic purpose of a buying and selling cooperative, and that a holding that the contributions in the present case are not contributions to capital, merely because they are tied in with this privilege and service, would be in effect a holding that there could never be a capital contribution by a member to a cooperative corporation of this kind.

This argument raises the question whether there is substance in the distinction that in the above cases the contributions in question were made, not by shareholders or members to their corporation, as in the pending case, but by *outsiders* to the corporation.

It will be noted that the Regulations under Internal Revenue Code, Section 118, relative to contributions to capital, deal mainly with contributions from a shareholder to his corporation and only incidentally with contributions by outsiders to a corporation.

The example given relative to contributions from shareholders to their corporation, recognizes the ordinary characteristics of capital contributions.

The example contains several elements, i. e., (1) The corporation *requires* additional funds for conducting its business; (2) Contributions from shareholders for that purpose are *voluntarily* made; (3) The contributions are *credited* to a surplus or special account; (4) The contributions are in the nature of assessments upon and *represent an additional price paid for the shares of stock held by the* individual shareholders; (5) The contributions are *not* made in consideration for goods or *services* rendered.

Neither party to the pending case has called our attention to any authority dealing with claimed contributions to capital by shareholders or members of corporations—cooperative or otherwise.

There are, of course, such cases. Some have dealt with the question whether payments or transfers from shareholders to ordinary corporations constituted income or capital contributions to the corporation. See: Chenango Textile Corp. v. Commissioner, 2 Cir., 148 F.2d 296; Commissioner v. Vandeveer, 6 Cir., 114 F.2d 719; Ackerman v. Commissioner, 7 Cir., 76 F.2d 833; Carroll-McCreary Co. v. Commissioner, 2 Cir., 124 F.2d 303; United States v. E. L. Bruce Co., 6 Cir., 180 F.2d 846; Jenkins v. Bitgood, 2 Cir., 101 F.2d 17. See also, Mertons 38.22, n. 67-71.

■ These cases recognize and apply the rule that contributions to a corporation by its shareholders, if unrelated to the rendition of corporate services or to any other consideration, are not income to the corporation, but capital contributions, virtually gifts, to the corporation, and, as such, not taxable income to the corporation.

When the question arises out of such contributions from shareholders to ordinary corporations, in which the proprietary interest is separate from patronage, it presents little difficulty.

When, however, the problem arises out of contributions from shareholders or members to a corporation in which the proprietary interest and the patronage are united, i. e., the rendition of the services of the corporation are conditioned upon payment by the shareholders or members of the required contributions— as in the case of this plaintiff cooperative—it presents greater difficulty.

Obviously, such contributions, required of stockholder or member-patrons, are made with a view to the rendition of the services of the corporation—in this case, for example, the privilege and service of large purchasing power and patronage refunds.

It will be readily noted that, if it should be broadly held that such contributions being for services rendered, cannot for this reason be considered contributions to capital within the meaning of the income tax law, the practical result would be that such a cooperative could not legally require its members to make capital contributions to their cooperative, no matter how genuine in fact and no matter how necessary or desirable such capital contributions might be, without having to pay income tax thereon.

Neither the income tax law nor the regulations go that far. They recognize that nontaxable capital contributions can be made to any corporation, cooperative or otherwise.

Cooperatives, like all corporations, require and must be able to obtain necessary working capital. The ordinary method of raising corporate capital is through the issuance of capital stock to stock subscribers and/or through borrowing capital in the form of bonds or debentures.

In the case of a nonstock cooperative, apart from the borrowing method, the equivalent of stock would be issuance of membership certificates and, if necessary, the requirement of further subsequent capital assessments or contributions in the nature of additional cost of the membership certificate or contributions to capital reserves. See Packel, Law of Cooperatives, 2d Ed., p. 180. It is natural that a cooperative should look primarily to its members for any necessary capital—and even to require capital from them as a condition of membership.

For obviously practical reasons, therefore, the issue whether claimed contributions to capital from shareholder or member-patrons of a cooperative like plaintiff constitute nontaxable contributions to capital, should not be resolved by broadly holding that capital contributions are not legally possible in such case, but rather, by the application of further practical tests to determine whether the disputed contribution in a particular case is in fact, a capital contribution as distinguished from a mere payment for services.

Several sources of guidance are available in the search for such practical tests.

First, there is the rationale of those cases which have dealt with the problem of capital contributions as it arises in the case of contributions to corporations by outsiders—for example, the cases already noted above. Those cases seem to have resolved the problem by inquiring whether a possible service or benefit to the contributor in return for his contribution is particular and immediate, e. g., the Detroit Edison and Teleservice cases, supra, or remote and general, e. g., the Brown Shoe case, supra.

Such a test, however, is not particularly helpful to the solution of the present problem because, as we have noted, contributions to this kind of a cooperative are obviously required as a condition for receiving important, particular and immediate services rendered to the contributor in his capacity as a patron.

We should pass, therefore, to cases which have dealt specifically with contributions from shareholder or member-patrons of a *cooperative*. There are such cases. The question of the income taxability of such contributions has been presented in various forms and has been resolved from various points of view— so much so, that the cases cannot be understood or reconciled without first bearing in mind the nature and the background of cooperatives. It is mainly for this reason that this memorandum decision has reached a length that would otherwise be unnecessary.

■ Broadly speaking, a cooperative is a corporation organized for the purpose of rendering economic services, without gain to itself, to shareholders or members who own and control it. Compare, Packel, supra, p. 3.

It is quite probable that income of a cooperative, which is so organized as to be in the relation of agent or trustee to its members, would not be considered income to the cooperative but, rather, the income of the principals or beneficiaries—the members.

The further question has been raised whether, entirely apart from the agency or trust theory, income of a cooperative, which by definition is not supposed to make gain for itself, is taxable income to the cooperative at all—within the meaning of the Sixteenth Amendment which contemplates the taxation only of gain to the taxpayer through use of its capital.

Whatever validity there is in this point has been recognized—partially and in two ways:

First, by federal income tax legislation expressly exempting certain kinds of cooperatives from payment of income tax, provided they meet certain conditions prescribed to make sure that the cooperative is in fact operating without gain to itself. See Internal Revenue Code (1939), Section 101(12), 26 U.S.C.A. § 101(12); Internal Revenue Code (1954) (Section 501–526) 521, 522, 26 U.S.C.A. §§ 501–526, 521, 522; see Waas & White (1942) Part II.

Ordinary nonagricultural business purchasing cooperatives, like plaintiff here, have not thus far been granted any such statutory exemption and plaintiff does not claim that it is so exempt.

■ Unless exempt under the provisions of such a statute, a cooperative stands upon the same basis as any other taxpayer with respect to determination of its taxable income. See Packel, supra, p. 231; see Waas & White, (1942) Part III; Farmers Cooperatives, CCH (1953 pp. 30–33).

Second, by judicial recognition that, regardless of its status as an agency or trust and regardless of its status as exempt or nonexempt, payments made by patrons to a cooperative under arrangement by which the cooperative is obligated to return to the patron, in the form of patronage refunds, any savings over and above operating expenses, do not constitute income to the cooperative. See Packel, p. 244; Uniform Printing & Supply Co. v. Commissioner, 7 Cir., 1937, 88 F.2d 75, 109 A.L.R. 966.

This rule is not based upon the ground that the cooperative is nonprofit. It is based upon the ground that patronage refunds, if obligated for return to the

patron, are in effect discounts or rebates to patrons or return of overcharges and, as such, not really income at all. Theoretically, at least, this rule could be invoked by any corporation, cooperative or otherwise.

This rule has been extended to include such portions of patronage refunds as are retained by the cooperative, under previous agreement with the shareholder or member-patron, as capital reserves in which the latter holds a specific interest which will eventually go back to him, either as a definite term indebtedness or, at least upon dissolution, as a contributed, definite capital interest. See Packel, p. 248.

With this background in mind, we can attempt to classify the cases which have considered the income taxability of contributions to cooperatives.

First, there are cases in which members of cooperatives have made payments, membership fees or dues in order to receive certain services from the cooperative. Although the income taxability of such payments arose in these cases out of a claim that the cooperative came within some statutory exemption, the courts have held that, if the corporation is not exempt, payments of this kind are taxable income to the cooperative for the reason that they are in effect payments for services to be rendered—for example, payments or dues by members of a nonprofit automobile club in order to be eligible to receive the services usually rendered by such clubs. See Keystone Automobile Club v. Commissioner, 3 Cir., 1950, 181 F.2d 402, 405, in which the court specifically states that, if a so-called nonprofit cooperative is not exempt under statute, "it is quite clear that its membership fees and dues are the price which the members pay for the services rendered." See also Jockey Club v. Helvering, 2 Cir., 1935, 76 F.2d 597; Automobile Club of Michigan v. Commissioner, 6 Cir., 1956, 230 F.2d 585, 586, affirmed 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746; Creasey Corp. v. Helburn, D.C.1932, 57 F.2d 204; United Retailer Grocers Ass'n

v. Commissioner, 1930, 19 B.T.A. 1016. See, also, Mertons, 38.22, n. 81 et seq.

The difference between the pending case and the above cases is that in the pending case the cooperative claims that what were formerly called dues have now become capital contributions as a result of its corporate resolutions and actions of December, 1951, above described.

Next, there are cases in which shareholder-patrons of cooperatives have made payments under arrangements that the payments, or part thereof, will be applied on the purchase of the contributor's unpaid stock subscription or applied to retirement of the bonded debt of the cooperative. The courts have recognized that contributions of this kind are contributions to capital and, as such, not taxable to the cooperative. See Realty Bond & Mortgage Co. v. United States, 16 F. Supp. 771, 83 Ct.Cl. 650; Garden Homes Co. v. Commissioner, 7 Cir., 64 F.2d 593; Cambridge Apartment Building Corp. v. Commissioner, 44 B.T.A. 617; see, also, 7 Mertens, supra, 38.22, n. 81–84.

It should be noted that in the pending case the claimed monthly contributions to capital were not earmarked for any such purpose. They were simply designated as capital contributions instead of, as formerly, dues. Nor is there anything in the corporate papers to preclude their use for any corporate purpose, operational or otherwise.

There have also been rulings which have been made on the question whether portions of otherwise obligated patronage refunds which have been retained by cooperatives as capital reserves should be excludable from income tax as deferred but definite payables to the patron either as term borrowings or as capital interests returnable on dissolution. See San Joaquin Valley Poultry Producers Ass'n v. Commissioner, 1942, 47 B.T.A. 1042; Midland Cooperative Wholesale v. Commissioner, 1941, 44 B.T.A. 824, 828; Home Builders Shipping Ass'n v. Commissioner, 1927, 8 B.T.A. 903; see, also, I.T. 3208 (C.B.1938–2, 127).

These rulings seem to have allowed the exclusion where the retained funds

were found in fact to be deferred payables to the patron and to have disallowed the exclusion when the retained funds could not be considered in fact either repayable to the patron on demand, or at a fixed time, or at least, on dissolution as a definite capital interest in the cooperative, and clearly established by the legal papers of the cooperative. See Waas & White (1942) pp. 148–155, for a discussion of such rulings.

Although the contributions retained by plaintiff in the pending case were not withheld from patronage refunds, but were collected as separate initial and monthly contributions, the implied requirement of these rulings, is that, if contributions are to be considered nontaxable as capital contributions, they should be clearly and definitely established as such by the corporate papers.

However, as has already been noted, the evidence in the pending case, including the corporate papers, makes no provision for the return of contributions either as fixed term loans or on dissolution as definite capital equity interests. This is highlighted by contrast with specific provisions for return of the initiation fee, the membership certificate payment and the capital payments into the so-called Guarantee Fund.

Nor, are the credits to the contributor transferable by him on resignation or withdrawal. They would remain in the cooperative and to the extent thereof inure to the gain of the cooperative or such members, existing at dissolution, as might be in a position to share any remaining equity.

There are also cases which have established that there must be equality of treatment for nonmembers if the cooperative is to qualify within the statutory policies laid down for exemption.

These cases, although dealing primarily with questions of statutory exemption, have recognized that where a cooperative fails to grant patronage refunds to nonmember customers, as well as to member customers, as in the present case, without according nonmembers some interest in capital accumulations attributable to their business, the result is that the cooperative to that extent is being operated for profit to its members as against nonmembers. Farmers Union Co-op. Co., etc. v. Commissioner, 8 Cir., 90 F.2d 488; Fertile Co-op. Dairy Ass'n v. Huston, 8 Cir., 119 F.2d 274.

The same principle is further applicable where, as in the pending case, the cooperative sets out to collect what it calls capital contributions from current members without provision for their interest in such capital accumulations after resignation or withdrawal. The net result is that their capital contributions inure to the benefit of the cooperative and to such succeeding member as may exist upon dissolution to claim a rateable share in its assets.

There are two cases in the Ninth Circuit with factual situations quite similar to the pending case in that they involved retentions by the cooperative of payments from members upon the claim that the retained funds were capital reserves.

In one of them, Co-operative Oil Ass'n v. Commissioner, 1940, 115 F.2d 666, the court held the contributions to be taxable income for the stated reason that the taxpayer had cited no statutory provision for exclusion of the contributions from income. Although this case was decided prior to 1954 Amendment, providing for exclusion of capital contributions from income, we must assume that the case was decided with knowledge that both the courts and administrative practice had long recognized the exclusion of such payments as were in fact capital contributions. We must, therefore, regard this case as having been rendered upon the factual situation before it which, as we have said, closely resembles the situation in the pending case and as holding in effect that the contributions there involved were not excludable as true capital contributions.

The other Ninth Circuit case, San Joaquin Valley Poultry Producers' Ass'n v. Commissioner, 1943, 136 F.2d 382, also quite similar in its facts, was decided to the contrary upon the stated ground that, under the particular California co-

operative statute under which the cooperative was organized, the funds involved never became the property of the cooperative but came into its hands only as agent and trustee of the members, distinguishing Co-operative Oil Ass'n v. Commissioner, supra, in that one respect, which is not involved or relied upon here.

■ From the foregoing considerations we are led to the conclusion that where contributions, although called capital contributions, are required by a cooperative from its members as a condition of the entitlement to its services, patronage refunds or otherwise, they should be held to be payments for those services, and, therefore, taxable income to the cooperative corporation, unless the evidence, including the corporate papers of the cooperative, shows that the contributions carry other entitlements apart from the services and so characteristic of capital contributions as to negative mere payment for services as their exclusive or primary purpose.

■ In the first place, they should be earmarked in some way for capital of the cooperative as distinguished from their use in reduction of ordinary operating expenses for which other income, or capital otherwise obtained, exists.

Secondly, the contributor should be accorded some stated and definite entitlement to a return of his contribution either as a fixed term repayable loan or, at least, as a definitely stated equity interest in the cooperative returnable on dissolution, reducible in amount only through proration with other contributors similarly situated and subject only to the claims of creditors.

Unless such characteristics of a capital contribution exist in the case of a cooperative of this kind, there is nothing to negative the prima facie inference that the required contributions were made with a view to and in consideration and payment for, services rendered by the cooperative to the member contributor.

Further, unless such characteristics of a capital contribution are required in

such a case, the door to tax avoidance is wide open.

For example, such a cooperative excludes from its gross income payments from members for their purchased groceries, over and above the computed actual cost of the groceries, upon the theory that such overages are obligated for return to the member patron and, therefore, constitute in effect, not income, but rebates or price reductions.

If, at the same time, the cooperative takes back with its other hand and retains from its member patrons monthly payments in the form of so-called capital contributions, such contributions, unless clearly committed for ultimate return to the member patron in some form of capital interest, may well constitute retentions pro tanto from the very rebates which the cooperative claims to have paid back in full.

By way of further example, unless the contribution is definitely committed for return to the contributor in some form of equity interest, his contribution is retained by the cooperative after his resignation or withdrawal and to the extent thereof inures to the gain of the cooperative or of such members as may exist to claim its assets, if any, at the time of dissolution—without the gain ever having been taxed either as income or capital gain.

Since our analysis of the evidence, including the corporate papers of the plaintiff cooperative, does not disclose any of the ordinary characteristics of capital contributions, in this case, the court finds from the evidence that these contributions are not capital contributions, but payments by members in consideration of, and in payment for, the services rendered by the corporation to the contributors and, therefore, taxable income to this nonexempt corporation.

■ Implied in the above finding is the Court's determination that the payments in question cannot qualify as excludable capital contributions upon the theory that they were gratuitous contributions, from the members to the cor-

poration, unrelated to corporate services or other consideration, and, therefore, virtually gifts to the corporation.

Such an inference from the evidence, including the corporate papers, would be unreasonable, if not fantastic, and the Court finds that such was not the fact.

■ The Court further finds from the evidence that the purported capital contributions were not voluntary payments within the meaning of Regulations, Sec. 1.118–1, but were on the contrary, payments required of members in consideration of corporate services rendered.

■ The Court further finds from the evidence in the case that the purported capital contributions were not required as additional capital for conducting its business, within the meaning of Regulations, Sec. 1.118–1, but that on the contrary there were other assets, actual and potential, ample for all reasonably necessary capital purposes.

■ It is true that two accounting experts testified for plaintiff that the contributions were entered as capital contributions and that such entry was in accordance with good and common accounting practice. However, mere accounting entries, although entitled to consideration, cannot preclude collection of income tax revenue if the proven and established facts indicate to the contrary. Sitterding v. Commissioner, 4 Cir., 80 F. 2d 939.

■ At the trial, evidence was offered by the government, and received over objection but subject to motion to strike, from members of plaintiff corporation to the effect that they deducted the contributions as business expense for purposes of their own income tax returns.

The Court, however, is of the opinion that such actions of members in their personal activities is not properly admissible on the issue of the intention and purpose of corporate action. See Shay v. Tuolumne Water Co., 6 Cal. 73; Van Vlaanderen v. Commissioner, 3 Cir., 175 F.2d 389. Therefore, pursuant to stipulation of both parties upon submission of

the case, such and all of such evidence is hereby stricken from the record and disregarded by the Court for purpose of its findings herein.

The prevailing party will submit findings of fact and conclusions of law and a proposed decree in accordance with this memorandum and serve a copy thereof upon the other party as provided by Rule 21 of this Court, West's Ann.Code.